**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

ROBERT C. CARDILLO, II,

                                        Plaintiff,

                v.

                                                        6:16-CV-134
CAROLYN M. COLVIN, COMMISSIONER                         (CFH)
OF SOCIAL SECURITY,

                                Defendant.

_____

**APPEARANCES:**                    **OF COUNSEL:**

Office of Peter M. Hobaica, LLC     B. BROOKS BENSON, ESQ.
2045 Genesee Street
Utica, New York 13501
Attorneys for Plaintiff

Social Security Administration      CATHARINE L. ZURBRUGG, ESQ.
Office of Regional General Counsel,
Region II
26 Federal Plaza, Rm. 3904
New York, New York 10278
Attorneys for Defendant

**Christian F. Hummel,
U.S. Magistrate Judge**

### MEMORANDUM-DECISION & ORDER

Plaintiff Robert C. Cardillo II brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner"

or "defendant") denying his applications for supplemental security income benefits

("SSI") and disability insurance benefits.  Dkt. No. 1 ("Compl.").[1]  Plaintiff moves for a

_____

[1]  Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. §
636(c), FED. R. CIV. P. 73, Local Rule 72.2(b), and General Order 18.  Dkt. No. 5.

finding of disability, and the Commissioner cross moves for a judgment on the pleadings. Dkt. Nos. 14, 16. For the following reasons, the determination of the Commissioner is remanded.

## I. Background

Plaintiff was born on January 4, 1983.  T at 72.  Plaintiff graduated from high school, and attended college for "a couple of months."  Id. at 34.  In school, plaintiff was in "resource class" and had "some type of learning disability."  Id. at 51-52.  Plaintiff's past work history includes a customer service representative at Subway, a sandwich shop, and a customer service representative at Defense Financing and Accounting Services.  Id. at 35-36.  Plaintiff was unable to continue his employment because "the stress of everything . . . makes my MS [multiple sclerosis] kind of flare up and my fingers don't work really, my hands[] are numb, I can't really feel the keyboard, I don't know what I'm typing.  Id. at 37.  Plaintiff resides with his fiancee and her family.  Id. at 37-38.  Plaintiff provided that he is 5' 5" tall and weighs 295 pounds.  Id. at 38.  Plaintiff spends his days watching television and reading.  Id.  He does not prepare meals or perform any household chores.  Id. at 38-39.  Plaintiff has a driver's license and drives approximately three times per week.  Id. at 39.  He is able to bathe and toilet himself, and his fiancee helps him dress.  Id. at 41.  Plaintiff smokes a half of a pack of cigarettes per day.  Id.

On June 27, 2013, plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental

security income.  T at 145-53.  Plaintiff alleged disability beginning on June 3, 2013.  Id. at 144.  These applications were denied initially on October 16, 2013.  Id. at 90-94. Plaintiff requested a hearing, and a hearing was held on June 19, 2014 before Administrative Law Judge ("ALJ") Gregory M. Hamel.  Id. at 31-69; 98-100.  The Appeals Council denied plaintiff's request for review, making the ALJ's findings the final determination of the Commissioner.  Id. at 1-4.  Plaintiff commenced this action on February 4, 2016.  Dkt. No. 1 ("Compl.").

## II. Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).   The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable

factfinder *would have to conclude otherwise*." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

## B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based on his or her age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical

and laboratory diagnostic techniques." Id. § 423(d)(3).  Additionally, the severity of the

impairment is "based [upon] objective medical facts, diagnoses or medical opinions

inferable from [the] facts, subjective complaints of pain or disability, and educational

background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018 (NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers
> whether the claimant has a 'severe impairment' which
> significantly limits his [or her] physical or mental ability to do
> basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry
> is whether, based solely on medical evidence, the claimant
> has an impairment which is listed in Appendix 1 of the
> regulations.  If the claimant has such an impairment, the
> [Commissioner] will consider him [or her] disabled without
> considering vocational factors such as age, education, and
> work experience; the [Commissioner] presumes that a
> claimant who is afflicted with a 'listed' impairment is unable
> to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment,
> the fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity
> to perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past
> work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan,134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner where the record contains substantial support for the ALJ's decision. See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). The Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

### C.  ALJ Decision

Applying the five-step disability sequential evaluation, the ALJ determined that plaintiff had not engaged in substantial gainful activity since June 3, 2013, the alleged date.  T at 20.  The ALJ found at step two that plaintiff had the severe impairments of multiple sclerosis, pulmonary embolism, deep vein thrombosis, and obesity.  Id. at 21. At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 22.  The ALJ then concluded that plaintiff retained the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he can only occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; he cannot climb ladders and similar devices; he cannot work in hazardous environments; and he can use the hands for frequent but not constant handling and fingering.

Id. at 22.

At step four the ALJ concluded that plaintiff "is capable of performing past relevant work as a customer service representative.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity."  T at 25.  Thus, the ALJ determined that plaintiff "has not been under a disability, as defined in the Social Security Act, from June 3, 2013, through the date of this decision."  Id. at 26.

### D.  Arguments

Plaintiff argues that (1) the ALJ erred in his consideration of the weight accorded to the opinions of treating physician Dr. Jessica Robb, M.D. and consultative examiner Tanya Perkins-Mwantuali, M.D.; (2) the ALJ failed to sufficiently set forth his findings relating to plaintiff's credibility; (3) the ALJ presented erroneous hypotheticals to the Vocational Expert; and (4) the ALJ failed to evaluate plaintiff's obesity properly.  See generally Dkt. No. 14.[2]

### 1. Weight Given to Medical Opinions

Plaintiff argues that the ALJ erred in declining to give controlling weight to Jessica Robb, M.D., plaintiff's neurologist, who concluded that plaintiff's multiple sclerosis meets listings 11.09A and 11.09 C.[3]  Dkt. No. 14 at 14.  Plaintiff further argues that the ALJ also erred in declining to give controlling weight to Dr. Robb's opinion that plaintiff has a less than sedentary RFC.  Id. at 19.  Finally, plaintiff contends that the ALJ improperly "cherry-picked" from the opinion of consultative examiner Tanya Perkins-Mwantuali, M.D., and provided an inconsistent report of the weight he accorded her opinion.  Id. at 21.  Defendant argues that the ALJ properly considered and declined to give controlling weight to Dr. Robb's opinions about Listing 11.09 and plaintiff's RFC

---

[2]  References to page numbers of the parties briefs are to the pagination generated by CM/ECF, not to the pagination in the parties' original documents.

[3]  The version of Listing 11.09 in effect at the time of the Administrative Law Judge's hearing included 11.09(C).  The current version now in effect does not have a part C.  However, the Court will rely on the version of the Regulation in effect at the time of the ALJ's decision.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.09 (effective Feb. 26, 2014 to Dec. 8, 2014).

as Dr. Robb's treatment was based on just two visits and "out of proportion to the degree and type of treatment Plaintiff had received." Dkt. No. 19 at 7-13. Defendant also contends that the ALJ's discussion of the weight he accorded to the consultative examiner's opinion was not inconsistent and was supported by substantial evidence. Id. at 13-14.

### a. Dr. Jessica Robb, M.D.

### i. Listings

Plaintiff argues that the ALJ improperly fails to give controlling weight to, or even mention, the Listing questionnaire, which he argues establishes that plaintiff met the requirements of Listing 11.09A – disorganization of motor function – and 11.09C – significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process. Dkt. No. 14 at 14-26.

"Impairments listed in Appendix 1 of the Social Security Regulations are 'acknowledged by the [Commissioner] to be of sufficient severity to preclude' substantial gainful activity. Accordingly, a claimant who meets or equals a Listing is 'conclusively presumed to be disabled and entitled to benefits.'" Knight v. Astrue, 32 F. Supp. 3d 210, 218 (N.D.N.Y. 2012) (quoting Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995)). In order for a claimant to demonstrate that his impairment meets or medically equals a listing, "the claimant must show that his or her impairments meet all

of the specified criteria." Id. (citing Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20

C.F.R. § 416.925(d)). Further, where "a claimant's impairment 'manifests only some of

those criteria, no matter how severely,' the impairment does not qualify." Id. (quoting

Sullivan, 493 U.S. at 530). The claimant bears the burden of establishing that his or her

impairment matches, or is equal in severity to, a Listing. Naegele v. Barnhart, 433

F.Supp.2d 319, 324 (W.D.N.Y. 2006) ("It must be remembered that plaintiff has the

burden of proof at step 3 that she meets the Listing requirements."). "To satisfy this

burden the claimant must offer medical findings equal in severity to all requirements,

which findings must be supported by medically acceptable clinical and laboratory

diagnostic techniques." Knight, 32 F. Supp 3d at 218 (citing 20 C.F.R. § 416.926(b)).

"When a claimant's symptoms appear to match those described in a listing, 'the ALJ

must explain a finding of ineligibility based on the Listings.'" Peach v. Colvin, No. 15-

CV-104S, 2016 WL 2956230, at *4 (W.D.N.Y. May 23, 2016).

Listing 11.09[4] provides:

> Multiple sclerosis. With:
>
> A. Disorganization of motor function as described in 11.04B;
> or
> B. Visual or mental impairment as described under the
> criteria in 2.02, 2.03, 2.04, or 12.02, or
> C. Significant, reproducible fatigue of motor function with
> substantial muscle weakness on repetitive activity,
> demonstrated on physical examination, resulting from
> neurological dysfunction in areas of the central nervous
> system known to be pathologically involved by the multiple sclerosis process.

---

[4] The Court relies on the version of the Listings in effect at the time of the ALJ's Decision. 20
C.F.R. § Pt. 404, Subpt. P, App. 1 (effective Feb. 26, 2014 to Dec. 8, 2014).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (effective Feb. 26, 2014 to Dec. 8, 2014).

Disorganization of motor function is defined as "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."[5]  20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.04(B) (effective Feb. 26, 2014 to Dec. 8, 2014).[6]

Listing 11.00(E) states:

> E. Multiple sclerosis. The major criteria for evaluating impairment caused by multiple sclerosis are discussed in listing 11.09.  Paragraph A provides criteria for evaluating disorganization of motor function and gives reference to 11.04B (11.04B then refers to 11.00C).  Paragraph B provides references to other listings for evaluating visual or mental impairments caused by multiple sclerosis. Paragraph C provides criteria for evaluating the impairment

---

[5]  Listing 11.00(C) provides:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.00(C) (effective Feb. 26, 2014-Dec. 8, 2014).

[6]  Listing 11.04 provides in full:

> Central nervous system vascular accident. With one of the following more than 3 months post-vascular accident:
>
> A. Sensory or motor aphasia resulting in ineffective speech or communication; or
>
> B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.04 (effective Feb. 26, 2014 - Dec.8, 2014)

of individuals who do not have muscle weakness or other significant disorganization of motor function at rest, but who do develop muscle weakness on activity as a result of fatigue.

Use of the criteria in 11.09C is dependent upon (1) documenting a diagnosis of multiple sclerosis, (2) obtaining a description of fatigue considered to be characteristic of multiple sclerosis, and (3) obtaining evidence that the system has actually become fatigued. The evaluation of the magnitude of the impairment must consider the degree of exercise and the severity of the resulting muscle weakness. The criteria in 11.09C deals with motor abnormalities which occur on activity. If the disorganization of motor function is present at rest, paragraph A must be used, taking into account any further increase in muscle weakness resulting from activity.

Sensory abnormalities may occur, particularly involving central visual acuity. The decrease in visual acuity may occur after brief attempts at activity involving near vision, such as reading. This decrease in visual acuity may not persist when the specific activity is terminated, as with rest, but is predictably reproduced with resumption of the activity. The impairment of central visual acuity in these cases should be evaluated under the criteria in listing 2.02, taking into account the fact that the decrease in visual acuity will wax and wane. Clarification of the evidence regarding central nervous system dysfunction responsible for the symptoms may require supporting technical evidence of functional impairment such as evoked response tests during exercise.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.00(E) (effective Feb. 26, 2014-Dec. 8, 2014). Disorganization of motor function, described by Listing 11.04B,

Dr. Robb completed a "Multiple Sclerosis Questionnaire (Listing 11.09)" form on July 16, 2014.[7] T at 395-96. Dr. Robb provided that plaintiff has multiple sclerosis,

---

[7] It appears this form is a document created by plaintiff's counsel that is specified for multiple sclerosis and the listing requirements under listing 11.09.

which was diagnosed through "[t]ypical clinical course, typical lesions in MRI[:] brain, cervical & thoracic cord." Id. at 395. Dr. Robb responded "yes" to a question inquiring whether plaintiff has "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station." Id. In "describing the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms," Dr. Robb provided that plaintiff's "[m]otor coordination is somewhat decreased in bilateral legs, causing some balance impairment, for which he sometimes uses a cane." Id. Dr. Robb responded "yes" to the question, "[d]oes your patient have any of the visual or mental impairments described above as stated in Listings 2.02, 2.03, 2.04, or 12.02.?" Id. She provided that the associated impairment was that "[h]e reports some decrease in short-term memory." Id. Dr. Robb answered "yes" in response to a question asking whether plaintiff has "significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process?" Id. at 396. When asked to describe the "degree of exercise and the severity of the resulting muscle weakness," Dr. Robb provided "he fatigue [sic] with repetition of tasks including walking." Id. Although the questionnaire asked, "[d]uring the past year, what are the exact dates of exacerbations of multiple sclerosis," Dr. Robb provided that it was "unclear" because plaintiff "has not been to the clinic between 7/14/14 and 7/25/13." Id. Finally, the questionnaire asked if plaintiff "complain[s] of a type of fatigue that is best described as lassitude rather than fatigue of

motor function." Id. Dr. Ross did not check either the "yes" or "no" boxes, instead she provided that plaintiff "has both types of fatigue, which can both occur in MS." Id.

The ALJ provided that

> [t]he objective medical evidence fails to establish that the claimant has a disorganization of motor function or visual or mental impairment, or significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, any of which would be necessary to meet or medically equal listing 11.09.

T at 22. He provided further that plaintiff did not meet or medically equal Listing 11.09 because he "seemed to do well with medication management for his impairment, and examination has generally shown that he has normal strength and reflexes." Id.

The ALJ recognizes that plaintiff's medical records demonstrate, on multiple occasions, that plaintiff was reported to be doing well with on medication. T at 202 ("has been feeling well"), 202 ("has been feeling fine") 264 ("MS that has been very much controlled with medications", 265 ("stable as far as weakness"), 268 ("has been fairly stable"), 320 ("very stable," "doing very well on Betaseron injection"). Further, the ALJ also properly observed that, at nearly all examinations, plaintiff was reported to have normal strength and reflexes. Id. at 199 ("normal strength), 320 (sensory exam in-tact, normal reflexes, cerebellar function in tact), 260 (normal bulk and tone, 5/5 strength), 264 (strength 5/5), 268 (good bulk and tone, 5/5 strength, sensory exam in tact, cerebellar function in tact), 271 (5/5 strength, cerebellar function in tact), 291 (5/5 strength). However, although the ALJ addressed records that discussed plaintiff's medication management and his full strength on examination, the ALJ did not address several other records suggesting plaintiff's numbness, fatigue, gait issues, balance

problems, and changes in his medication in relation to whether he met the listing. Moreover, in his listings discussion, the ALJ references just three medical records – one from 2011, one from May 2013, and one from August 2013. T at 22 (citing Exh. 1F at 3-5 (T at 200-03); Exh. 2F at 11 (T at 265) ; Exh 4F at 5 (T at 321)). The 2011 records are from well before the onset date and appear to be prior to his MS diagnoses, and the May[8] and August 2013 records citation excludes several other records from near that time period that do suggest greater limitations. See id.

There is evidence that, beginning in June 2013 – the time of plaintiff's alleged onset – there was an exacerbation of plaintiff's condition. However, the ALJ's listings discussion does not address this exacerbation or the nature of the condition.[9] Although plaintiff's condition was reported to be stable, at a June 13, 2013 appointment, plaintiff's neurologist, Dr. A. Shatla, MD, noted an "[e]xacerbation, ""remitting relapsing" of plaintiff's MS "with "increased fatigue," "increased weakness and spasticity and blurring of vision." T at 261-62. Plaintiff experienced an unsteady and hemiplegic gait on June 13, 2013; a wide-based gait, significant sway on tandem, and sway with Romberg on June 25, 2013. On July 1, 2013, plaintiff had a wide-based gait, significant sway on tandem, sway with Romburg, and decreased vibration in "R>L

---

[8] Although the May 2013 record is also from before the June 2013 onset date, as it is very close in time to the onset date, the Court finds its consideration relevant to an assessment whether plaintiff was disabled at the time of his alleged onset date.

[9] The SSA's Program Operations Manual System ("POMS") provides that "[m]ost cases of MS involve intermittent periods of symptoms and signs (exacerbation) followed by a period of improvement (remission). Exacerbations vary in frequency, duration, character and severity. Remissions similarly vary in duration and the extent of improvement." See DI 24580.015 EVALUATION OF MULTIPLE SCLEROSIS (MS), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424580015 (last visited Mar. 17, 2017).

toes." On August 2, 2013, plaintiff's gait was "steady" but "mildly hemiplegic." Id. at 320. His gait and station were reported to be normal during the September 2013 consultative examination, but he was unable to walk on his toes, perform tandem walk, or complete the Romberg test, "lost his balance and fell backwards" with extension of his cervical spine, and "began to lose his balance" at 30 degrees flexion of the cervical spine. Id. at 376-77. On July 14, 2014, plaintiff's gait was "wide based" and "antalgic." Id. at 399. He had "sway on both Romberg and tandem gait." Id. He completed a "25 ft walk 7.8 sec without assistive device." Id. The only objective medical evidence of trouble with his hands, beyond plaintiff's self reports, is the September 2013 consultative examination wherein plaintiff had weak pincer grip, but otherwise had full grip strength and could button, zip, tie, and velcro. Id. at 377.

A full review of the medical record shows that there is evidence that suggests that plaintiff may meet the requirements of either Listings 11.09(A) or (C). Further clarification as to why plaintiff's symptoms, particularly those presented in June 2013 forward, do or do not meet the listing requirements is necessary because the ALJ did not discuss how he considered several medical records suggesting limitations in gait and balance, fatigue, as well as an exacerbation of plaintiff's condition. See Peach, 2016 WL 2956230, at *3 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526) ("It is particularly important for an ALJ to specifically address conflicting probative evidence with respect to the step three analysis, because a claimant whose condition meets or equals that of a Listing is deemed disabled per se and eligible to receive benefits."). Further, the regulations provide that, for conditions that are "episodic" in character, such

as multiple sclerosis, "consideration should be given to frequency and duration of exacerbations, length of remissions and permanent residuals." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (11.00(D)). However, the ALJ did not address the "episodic" or intermittent nature of this condition and the effect of plaintiff's exacerbations, which appear to have begun in or around June 2013. T at 261.

> When a claimant's symptoms appear to match those described in a listing, "the ALJ must explain a finding of ineligibility based on the Listings." The ALJ can use one of two approaches. First, the ALJ can "compar[e]. . . the symptoms, signs, and laboratory findings about the impairment, including any functional limitations that result from the impairment, with the corresponding criteria shown for the listed impairments." Second, if the ALJ chooses not to conduct this comparison, the ALJ must "expressly adopt a medical source statement that discusses the medical evidence and arrives at express conclusions concerning the Listings."

Peach, 2016 WL 2956230, at *4 (internal citations omitted). Here, in concluding that plaintiff did not meet listing 11.09 because he "seemed to do well with medication management" and because "[e]xamination has generally shown he has normal strength and reflexes," the Court cannot determine whether the ALJ consider later medical records suggesting both an exacerbation of plaintiff's MS, as well as the presence of other symptoms set forth in the listings. T at 22. Thus, the ALJ has failed to fully complete either of the above approaches in making a listing determination. Peach, 2016 WL 2956230, at *4.

Thus, on remand, the ALJ must provide a discussion as to the medical evidence relied upon and explain why plaintiff's apparent gait and balance problems, limited range of motion, and difficulty with fatigue do not amount to a sustained disturbance or

17

a persistent disorganization of motor function.  See generally Krupnick v. Colvin, 13-CV-3992, 2015 WL 1298626, at *7 (E.D.N.Y. Mar. 23, 2016).  Further, the Commissioner should address whether and how plaintiff's exacerbation, which led to a change in his medication management, as well a decrease in his strength, impacts the Listing determination.

The Court clarifies, however, that in finding that the ALJ's listing discussion is not supported by substantial evidence, the Court does not find that the ALJ violated the treating physician rule insofar as it relates to Dr. Robb's Listing Questionnaire by mere failure to mention the questionnaire.  Dkt. No. 14 at 15.  The ALJ did not commit reversible error in his consideration of Dr. Robb's Listing Questionnaire, but in his failure to discuss objective medical evidence that may suggest that plaintiff's conditions could equal the listing requirements and why he believed such evidence to be insufficient.  The listing questionnaire does not define many of the terms it asks Dr. Robb to assess.  T at 395-96.  For example, it does not define the legal terms "significant and persistent," "sustained disturbance," and "substantial" nor inform Dr. Robb whether she is to adopt a plain meaning of these terms, her medical understanding of these terms, or the legal meaning of these terms, as set forth in the regulations and case law.   Id. at 395.  However, even if the questionnaire did give definitions of these terms, Dr. Robb's answers do not indicate that plaintiff clearly fits within them.

As noted, when asked if plaintiff had "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and

dexterous movement or gait and station," Dr. Robb responded that plaintiff had "somewhat decreased" motor coordination in his legs, "some" balance impairment, for which he "sometimes" uses a cane.  T at 395.  As for visual or mental impairments, Dr. Robb provided that plaintiff "reports" "some decrease" in short term memory.  Dr. Robb did not indicate the degree or severity of muscle weakness, instead reporting that he fatigues with repetition of tasks, such as walking.  Thus, although Dr. Robb affirmatively indicated that plaintiff experienced "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station," had "mental impairments . . . as stated in Listings 2.02, 2.03, 2.04, or 12.02," and fatigue "that is best described as lassitude" as well as "fatigue of motor function," such responses do not alone indicate that plaintiff has met the listings.  Thus, Dr. Robb's listing questionnaire does little to support a finding that plaintiff meets Listing 11.09 because, despite Dr. Robb's responses to the checked boxes, her additional explanation suggests something less than "significant and persistent" and a "sustained disturbance."

Although the Court concludes that the ALJ's failure to directly address Dr. Robb's listing questionnaire, without more, is not reversible error, as the Court does find that the ALJ did not sufficiently set forth support for his conclusion that plaintiff did not meet Listing 11.09, on remand, the Commissioner should consider the Listing Questionnaire and whether it is entitled to any weight in the step three analysis.

## ii. RFC Assessment

Plaintiff contends that the ALJ erred in declining to accord controlling weight to Dr. Robb's RFC assessment that plaintiff has a less than sedentary RFC. Dkt. No. 14 at 17. Plaintiff suggests that the ALJ erroneously failed to consider Dr. Robb a treating physician because plaintiff visited Dr. Robb on only two occasions and because there was an eleven-month gap in treatment between these visits. Id.

Dr. Robb provided an RFC assessment dated July 16, 2014, which set forth a diagnosis of "[m]ultiple sclerosis - relapsing remitting." T at 388. She stated her clinical findings as "[m]ildly choppy pursuits, initial formal strength testing is full, although he fatigues quickly, brisk ankle reflexes, decreased vibration at toes, sway on Romberg, antalgic gait." Id. Plaintiff's treatment was with Betaseron, but Dr. Robb indicated that she will "change to Gilnenya due to breakthrough disease." Id. Answering a question regarding plaintiff's response to treatment, Dr. Robb provided, "[b]reakthrough disease." Id. His prognosis was "[c]hronic disease with possible future relapses causing[10] new neurologic symptoms." Id.

Dr. Robb opined that plaintiff could never lift or carry any amount of weight due to "significant fatigue." T at 389. She provided that plaintiff could sit for two hours at one time, stand for one hour at one time, and walk for twenty minutes at one time. Id. at 390. Dr. Robb further provided that plaintiff could sit for a maximum of six hours, stand for a maximum of one hour, and walk for a maximum of twenty minutes in an eight-hour work day. Id. Dr. Robb stated that plaintiff "may require rest breaks" in

---

[10] This word is somewhat illegible, and appears to state "causing." T at 388.

response to a query asking, "[i]f the total time for sitting, standing and walking does not equal or exceed 8 hours, what activity is the individual performing for the rest of the 8 hours?" Id. Dr. Robb indicated that plaintiff "sometimes" needs a cane to ambulate. Id. Responding to how far plaintiff could ambulate without a cane, Dr. Robb provided that "it depends, was seen walking 50 feet without cane." Id. When using a cane, plaintiff could use his free hand to carry small objects. Id. In support findings about plaintiff's sitting, standing, and walking limitations, Dr. Robb provided that the "medical or clinical findings" that support her assessment of limitations is that plaintiff "fatigue [sic] easily." Id.

Regarding plaintiff's use of his hands, Dr. Robb surmised that plaintiff could never push or pull with either hand, and could occasionally reach, handle, finger, and feel with both hands. T at 391. The medical and clinical finding supporting Dr. Robb's conclusion is that plaintiff "[f]atigues easily." Id. Plaintiff could occasionally use both of his feet to operate foot controls. Id. Dr. Robb's limitation on plaintiff's use of his feet was because he "[f]atigues easily." Id. Dr. Robb provided that plaintiff could never climb stairs, ramps, ladders, or scaffolds; balance, stoop, kneel, crouch, or crawl. Id. at 392. Her clinical or medical findings supporting these limitations are plaintiff's "[p]oor balance" and his "fatigue." Id. Answering question asking whether plaintiff's impairments affect his hearing or vision, Dr. Robb checked the "yes" box, and added that plaintiff "has symptoms, on exam 20/20 vision found." Id.

Dr. Robb answered that plaintiff must avoid ordinary workplace hazards, but is able to read small print and ordinary newspaper or book print, view a computer screen

and determine the difference in shape and color of small objects.  T at 392.  Dr. Robb set forth the following environmental limitations: frequent (1/3 to 2/3) use of a motor vehicle; occasional (up to 1/3) exposure to humidity, wetness, and vibrations; and no exposure to unprotected heights; moving mechanical parts; dust, odors, fumes, and pulmonary irritants; and extreme cold and heat.  Id. at 393.  Plaintiff is limited to quiet to moderate noise levels.  Id.  Dr. Robb's medical or clinical findings to support these limitations are that his "[p]oor balance makes certain actions potentially dangerous. Extreme temperatures can bring out MS symptoms."  Id.  Dr. Robb provided that plaintiff could shop, travel without a companion, walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, prepare a simple meal and feed himself, care for his personal hygiene, and sort/handle/use paper or files.  Id. at 394. She indicated that plaintiff could not climb a few stairs at a reasonable pace with use of a single hand rail because he "fatigues quickly."  Id.

The ALJ accorded Dr. Robb's opinion regarding plaintiff's RFC "very little weight" because "it is based on only two visits with this physician" and plaintiff "had no treatment for a year prior to the time this opinion was rendered."  T at 25.  Further, the ALJ stated that Dr. Robb's opinion "seems out of proportion to the type and degree of treatment the claimant has needed[,]" observing that plaintiff "has not had any physical therapy or surgical intervention, and there is little evidence of any symptom exacerbation that has required trips to the emergency room or hospitalization."  Id.

Although a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings

and not inconsistent with other substantial evidence in the record.  Veino v. Barnhart,

312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  Where the treating

physician's opinion is contradicted by other substantial evidence, the ALJ is not required

to give the opinion controlling weight.  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir.

2004).  The ALJ must, however, properly analyze the reasons that the report is

rejected.  Id.  An ALJ may not arbitrarily substitute his or her own judgment for

competent medical opinion.  Rosa v. Callahan, 168 F .3d 72, 79 (2d Cir. 1999).  As the

Second Circuit has oft repeated,

> [w]hen controlling weight is not given to a treating
> physician's assessment, the ALJ must consider the following
> factors to determine the weight to give the opinion: (1) the
> length of treatment relationship and frequency of
> examination; (2) the nature and extent of the treatment
> relationship; (3) the evidence in support of the opinion;
> (4) the opinion's consistency with the record as a whole;
> (5) whether the opinion is that of a specialist; and (6) any
> other relevant factors.

Monroe v. Comm'r of Soc. Sec., No. 16-1042-CV, __ Fed App'x __, 2017 WL 213363,

at *2 (2d Cir. Jan. 18, 2017) (summary order) (citing 20 C.F.R. § 404.1527(c)).

Despite plaintiff's outrage at the ALJ's pointing out that plaintiff met with Dr.

Robb on only two occasions, Dkt. No. 14 at 17, acknowledging the fact that plaintiff had

just two visits with Dr. Robb was not improper, as the regulations direct that the ALJ

consider the frequency, length, nature, and extent of the treatment relationship.  20

C.F.R. § 404.1527(c).  Further, although plaintiff contends that the reason for his

eleven-month delay in returning to Dr. Robb for further treatment was because he was

completing "Gilenya pre-testing," absent from the record is any information as to

23

whether a year to complete the pre-testing was typical and beyond plaintiff's control or whether it was due to plaintiff's own delay in timely obtaining the necessary testing.  Id. Thus, the Court finds that the ALJ committed no error in considering that plaintiff visited Dr. Robb on two occasions, with nearly a year gap in between, in determining to accord less weight to her opinion.

Plaintiff appears to take most issue with the ALJ's consideration of the apparent evidence in support of the ALJ's opinion, and argues that the ALJ committed reversible error insofar as he did not address several of Dr. Robb's findings or evidence in support of her findings.  Specifically, plaintiff argues that the ALJ failed to give good reasons prior to rejecting Dr. Robb's findings relating to plaintiff's (1) ability to lift or carry any weight, (2) ability to use his hands due to bilateral hand numbness, (3) ability to stand for one hour and walking for twenty minutes, (4) loss of balance, (5) need to use a cane, (6) ability to stoop.  Dkt. No. 14 at 21-23.

In according Dr. Robb's opinion "very little weight," the ALJ appears to place great emphasis on the fact that many of plaintiff's treatment notes demonstrate normal strength and normal gait.  T at 23-25.  However, as plaintiff's records show, multiple sclerosis is a relapsing condition which can cause periods of exacerbation and periods of improvement or temporary remission.  THE MERCK MANUAL OF DIAGNOSES AND THERAPY 1779, 1782 (19th ed. 2011) ("Typically, neurological deficits are multiple, with remissions and exacerbations gradually producing disability."; "The course is highly varied and unpredictable."); DI 24580.015 EVALUATION OF MULTIPLE SCLEROSIS (MS).[11]

---

[11] https://secure.ssa.gov/apps10/poms.nsf/lnx/0424580015 (last visited Mar. 17, 2017)

Dr. Robb opined that plaintiff's above limitations were largely caused by plaintiff's fatigue. T at 388-94. However, beyond noting that plaintiff reported feeling "constantly weak and fatigued," and that plaintiff "is not able to do anything around the house and spends his days watching television," the ALJ did not address plaintiff's fatigue or explain how plaintiff's limited activities contradicted his fatigue or Dr. Robb's findings relating to his fatigue. Id. at 23. Indeed, there is evidence in the record that appears to offer explanation regarding plaintiff's normal grip testing – Dr. Robb noted that, although plaintiff's "initial formal strength testing is full, . . . he fatigues quickly." Id. at 388. Yet, the ALJ does not address this finding.

Further, in according less weight to Dr. Robb's opinion, the ALJ notes that, in contrast to Dr. Robb's significant limitations she set forth for plaintiff, plaintiff's examination findings were "not strong." Indeed, the ALJ makes note of full muscle strength during plaintiff's consultative examination. T at 24. He also notes that there is "limited evidence" of deficits in the use of the hands or the gait. Id. However, the ALJ does not address why several medical records expressing gait deficiencies amounted to "limited evidence." Id. The ALJ does not address plaintiff's June 13, 2013 visit with Dr. Shatla, who noted plaintiff's gait was "unsteady" and "hemiplegic"; a July 1, 2013 visit with Dr. Goodman where plaintiff had a wide-based gait, significant sway on tandem, sway with Romberg testing, decreased vibration in his toes; August 2, 2013 visit with Dr. Shatla where plaintiff's gait was steady but mildly hemiplegic and his strength was 3/5; or the July 14, 2014 visit with Dr. Robb where plaintiff demonstrated a wide-based gait, significant sway on tandem, sway with Romberg. Id. at 261, 291, 320,

325.  Thus, despite the ALJ's finding that there was little evidence of deficits with plaintiff's gait, there are many medical records that suggest that plaintiff had gait limitations beginning in June 2013.

Similarly, the ALJ does not express why Dr. Perkins-Mwantuali's findings relating to plaintiff's balance and range of motion were "not strong."  At a September 10, 2013 consultative examination before Dr. Tanya Perkins-Mwantuali, plaintiff had a normal gait and station, but was unable to walk on his toes "as he could not maintain the position."  Id. at 377. Plaintiff could not tandem walk "as he immediately lost balance." Id.  Plaintiff could not perform Romberg test because he "fell backwards."  Id.  His and finger dexterity were reported to be "in tact," with strong bilateral grip strength but "weak" pincer grasp.  Id.  Plaintiff experienced pain with flexion and extension of his cervical spine at ten to fifteen degrees.  Id.  His rotation of the cervical spine was full bilaterally.  Id.  His lateral extension of the cervical spine was 30-35 degrees bilaterally. Id.  Plaintiff's lumbar spine extension was 20 degrees, flexion was 30 degrees, and lateral flexion is 20 degrees bilaterally, with full rotation.  Id.  Plaintiff "lost his balance and fell backwards" with extension, and "began to lose his balance" at 30 degrees flexion.  Id. .  Dr. Perkins-Mwantuali described plaintiff's rapid alternating movements as "slow and deliberate."  Id.  Plaintiff's heel-to-shin testing was "awkward" as plaintiff "had difficulty getting the knee the shin and difficulty maintain [sic] the heel along the shin." Id.  Plaintiff had "three beats of clonus" in the left foot.  Id.  During backward extension, abduction, and adduction, "the leg upon which the weight was being placed gave out." Id.  Plaintiff experienced decreased sensation to pain in the left medial leg.  Id.  He

otherwise had a normal sensory exam.  Id.

Insofar as the ALJ accorded less weight to Dr. Robb's findings because it was "out of proportion to the type and degree of treatment the claimant has needed," noting that plaintiff has not had physical therapy, surgical intervention, or emergency room visits or hospital admissions, the Commissioner has not demonstrated that such options existed for plaintiff.  The ALJ points to no evidence that physical therapy or surgery was recommended to plaintiff, and that he refused, or that surgery of any kind is performed as a method of treating multiple sclerosis.  Similarly, the ALJ does not demonstrate that hospitalization is common for severe multiple sclerosis.  See generally Medick v. Colvin, 16-CV-341 (CFH), 2017 WL 886944, at *12 (N.D.N.Y. Mar. 6, 2017); Matamoros v. Colvin, 13-CV-3964 (CW), 2014 WL 1682062, at *4 (C.D. Cal. Apr. 28, 2014) ("The ALJ cannot fault [the claimant] for failing to pursue non-conservative treatment options if none exist.").  As the ALJ is not a qualified medical expert, he cannot make his own assessment as to the degree of treatment that would be considered reasonable for a chronic case of multiple sclerosis without some evidence to support such a conclusion. See generally Rudder v. Colvin, 11-CV-50286, 2014 WL 3773565, at *12 (N.D.Ill. July 30, 2014) ("The ALJ may be correct that disabling limitations from multiple sclerosis would result in more frequent treatment or need for medication. However, the ALJ must include evidence to support such a conclusion in his opinion because he is not qualified, on his own, to make such determinations.") (internal citations and quotations omitted).  Further, despite essentially concluding that plaintiff underwent conservative treatment, the ALJ does not address that Dr. Robb switched plaintiff's medication from

27

Betaseron to Gilenya[12] "due to breakthrough disease" and that the change in medication was due to symptom exacerbation, despite not requiring "hospitalization." T at 25, 388. Ultimately, as the ALJ does not demonstrate that physical therapy or surgical intervention were recommended to plaintiff but refused, nor present medical support for his finding that plaintiff's course of treatment was considered conservative for multiple sclerosis, his reliance on these findings in according Dr. Robb less weight was erroneous.

Accordingly, the Court is unable to determine whether the ALJ considered various medical records suggesting greater limitations that those pointed out by the ALJ. Thus, the Court cannot conclude that the determination to accord very little weight to treating physician Dr. Robb because her findings were in conflict with other medical evidence of record – such as plaintiff's apparent limited symptomology and treatment – is supported by substantial evidence. On remand, the Commissioner must explain why the remainder of plaintiff's treatment records, and other medical opinions, suggest lesser limitations than those opined by Dr. Robb.

### 2. Consultative Examiner Tanya Perkins-Mwantuali, M.D.

Plaintiff argues that the ALJ improperly cherry-picked from portions of Dr. Perkins-Mwantuali's opinion by declining to accord weight to the portions of her opinion that support plaintiff's limitations. Dkt. No. 14 at 21. Plaintiff further argues that the

---

[12] Gilenya is for "[t]reatment of relapsing forms of multiple sclerosis (MS) to reduce the frequency of clinical exacerbations and to delay the accumulation of physical disability." Physicians' Desk Reference S-390 (71st ed. 2017).

ALJ's review of Dr. Dr. Perkins-Mwantuali's opinion is internally inconsistent and it is unclear the level of weight given to this report. Id.

The ALJ provided that he gave

> [s]ome limited weight to consultative examiner, Dr. Perkins-Mwantuali who opined that the claimant should avoid environmental hazards and that he had a moderate to marked limitation with walking, standing, pushing, pulling, and postural movements. This opinion is given *significant weight*, although based on a single examination of the claimant in 2013, as it is consistent with the other evidence of the record.

T at 25 (emphasis added).

Although an ALJ may properly accord some weight to portions of an opinion and decline to accord weight to other portions without committing improper "cherry picking", where such portions are found to be unsupported by objective medical evidence, Venio v. Barnhart, 314 F.3d 578, 588 (2d Cir. 2002), here, it is entirely unclear whether the ALJ accorded "great weight" or "some limited weight" to Dr. Perkins-Mwantuali's opinion. Defendant contends that "the ALJ's meaning is apparent from the context of the statement – the fact that the opinion was based on a single examination limited the weight that the ALJ gave the opinion, but he still believed it deserved significant weight, despite that limitation." Dkt. No. 16 at 13. The Court disagrees. A plain reading of this portion of the ALJ's determination does not reveal to the reader whether the ALJ accorded Dr. Perkins-Mwantulai's opinion limited weight or significant weight. See Seifried ex rel. ABB v. Commissioner of Soc. Sec., 13-CV-347 (LEK/TWD), 2014 WL 4828191, at *6 (N.D.N.Y. Sept. 29, 2014) . Even if the Court to adopt defendant's proposed interpretation that the ALJ accorded the opinion "significant weight," lessening

29

the weight slightly because it was based on one examination, then it would be entirely unclear how the ALJ considered Dr. Perkins-Mwantulai's findings that plaintiff had moderate to marked limitations in his ability to stand, walk, push, pull, engage in various postural movements, and be exposed to environmental hazards in making his RFC findings, as the ALJ's RFC does not appear to accommodate moderate to marked limitations in these areas. T at 22. The lack of clarity is significant as the Court finds that the ALJ's decision to accord very little weight to Dr. Robb's findings was not supported by substantial evidence, especially because some of Dr. Perkins-Mwantuali's findings may be read as supporting certain limitations in plaintiff's ability to balance or perform fine finger manipulations. Id. at 379.

Accordingly, on remand, any discussion of Dr. Perkins-Mwantuali's RFC must be accompanied by a clear statement of the level of weight it is accorded. Further, if differing degrees of weight are accorded to various portions of the same opinion, it must be clear to the reader the level of weight the ALJ accorded to each portion and why.


### 3. Credibility

"It is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dept. of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citation omitted). When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). The regulations set

out a two-step process for assessing a claimant's statements about pain and other

limitations:

> At the first step, the ALJ must decide whether the claimant
> suffers from a medically determinable impairment that could
> reasonably be expected to produce the symptoms alleged
> . . . . If the claimant does suffer from such an impairment, at
> the second step, the ALJ must consider the extent to which
> the claimant's symptoms can reasonably be accepted as
> consistent with the objective medical evidence and other
> evidence of record. The ALJ must consider statements the
> claimant or others make about his impairment(s), his
> restrictions, his daily activities, his efforts to work, or any
> other relevant statements he makes to medical sources
> during the course of examination or treatment, or to the
> agency during interviews, on applications, in letters, and in testimony in its administr

Suarez v. Colvin, 102 F. Supp. 3d 552, 579 (S.D.N.Y. 2015) (internal citation omitted).

> Conclusory findings of a lack of credibility will not suffice;
> rather, an ALJ's decision "must contain specific reasons for
> the finding on credibility, supported by the evidence in the
> case record, and must be sufficiently specific to make clear
> to the individual and to any subsequent reviewers the weight
> the adjudicator gave to the individual's statements and the
> reasons for that weight."

Osario v. Barnhart, No. 04 CIV. 7515, 2006 WL 1464193, at *6 (S.D.N.Y. May 30,

2006) (quoting Evaluations of Symptoms in Disability Claims: Assessing the Credibility

of an Individual's Statements, Social Security Ruling 96-7p, 61 Fed.Reg. 34,383,

34,484 (July 2, 1996) ("SSR 96-7p"). "A finding of credibility made by an ALJ is entitled

to deference by a reviewing court. 'As with any finding of fact, '[i]f the Secretary's

findings are supported by substantial evidence, the court must uphold the ALJ's

decision to discount a claimant's subjective complaints.'" Id. (quoting Aponte, 728 F.2d

at 591.

The ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." T at 24. In explaining his reasoning, the ALJ provided that plaintiff's "allegations of his symptoms do not correspond with the medical evidence." Id. The ALJ acknowledged that plaintiff "has had some evidence of ataxia and numbness," but concluded that "his physical examination findings are not strong." Id. The ALJ observed that, other than the consultative examination, where plaintiff was reported to have weak pincer grasp but otherwise normal grip strength, "there was limited evidence of any deficits in the use of the hands or in the gait, and his muscle strength was full." Id. Further, the ALJ observed that plaintiff used a cane at the hearing, but that it was not prescribed, rather given to him by a family member. Id. Further, the ALJ concluded that "some of plaintiff's assertions are not supported by evidence in the record." Id. at 24. Addressing plaintiff's claims of memory difficulties, the ALJ provided that "this was not noted in the consultative examination," and plaintiff had "no difficulty understanding and responding to questions at the hearing, and he was able to recite details about anything asked, including the name of his medications." Id. Finally, the ALJ observed that plaintiff continues to smoke, against medical advice, and noted that "[w]hile this factor is not conclusive as to any issue in this case, it does tend to suggest that Mr. Cardillo is not as limited as he has portrayed himself to be." Id.

Although the ALJ set forth his reasoning for finding plaintiff's allegations to be

32

less than credible, a review of those reasons does not support the ALJ's decision to find plaintiff's claims of pain and limitation less than credible. The ALJ relied, in part, on plaintiff's reported activities of daily living. T at 24. The ALJ noted that plaintiff reported "that he is not able to do anything around the house and that he spends his days watching television," but observed that "he did admit that he was able to drive a car and had no difficulties using the foot pedals or maneuvering the steering wheel and gearshift. Overall, there is nothing to suggest that he could not be more active." Id. Although plaintiff testified that he was able to drive, this does not, without more, support a finding that plaintiff is engaged in significant activities of daily living. Plaintiff testified at the hearing that he is able to drive because driving involves sitting, of which he is capable. Id. at 55. Further, Dr. Robb did opine that, even with the significant limitations she set forth, plaintiff was able to sit for six hours a day, for two hours at one time, and could "frequently" operate a motor vehicle.[13]  Id. at 393. Beyond plaintiff's report of watching television all day, the ALJ does not refer to any reported activities that conflict with plaintiff's claims of limitation. Id.; cf. Cichocki v. Astrue, 729 F.3d 172, 178 (2d Cir. 2013) (finding the ALJ properly relied on the plaintiff's activities of daily living, including the plaintiff's ability to walk dogs and clean, consistent with an RFC to perform light work).

Instead of explaining how plaintiff's report that he performs no work around the house, watches television all day, but could drive supports a finding that plaintiff was

_____

[13]  The Court does observe that Dr. Robb's finding that plaintiff could "frequently" operate a motor vehicle may be inconsistent with her finding that plaintiff could only "occasionally" operate foot controls. T at 391-92.

capable of sedentary work, the ALJ references plaintiff's smoking, which he concludes "does tend to suggest that Mr. Cardillo is not as limited as he has portrayed himself to be." T at 24. Although a claimant's smoking against medical advice may be considered in a credibility assessment, it is entirely unclear from the ALJ's decision how plaintiff's smoking supports a conclusion that plaintiff is less limited than alleged.[14] See Goff v. Astrue, 993 F.Supp. 2d 114, 128. Moreover, even if the ALJ had provided an explanations, in order to accord less credit to a plaintiff for continuing to smoke against medical advice, consideration must be made to the plaintiff's reason for failing to comply. Id. ("[G]iven the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health.").[15]

It is well-settled that a claimant is not required to be able to do no activities of daily living in order to be found disabled. Here, the ALJ concludes that "there is nothing to suggest" that plaintiff "could not be more active' and that plaintiff "is not as limited as he has portrayed himself to be," the only support he sets forth for these findings is that plaintiff drives, watches television, and smokes. T at 24. The ALJ has not provided a complete analysis of how plaintiff's limited activities contradicted with his statements of

---

[14] For instance, the ALJ did *not* state that plaintiff's smoking exacerbates his symptoms, such as when a claimant suffers from a lung-related condition such as asthma, emphysema, or lung cancer, nor does he argue that plaintiff would not smoke if his symptoms were so severe. The Court does note, though, even if the ALJ had made these findings, he would need to provide medical support for these claims. Moreover, even if the ALJ had provided an explanation, in order to accord less credit to a plaintiff for continuing to smoke against medical advice, consideration must be made regarding the addictive nature of cigarettes and whether the plaintiff had good reasons for failing to quit. See Goff v. Astrue, 993 F.Supp.2d 114, 128 (N.D.N.Y. 2012) ("[G]iven the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health.").

[15] The Court finds no error regarding the ALJ's findings regarding plaintiff's memory difficulties, as the Court agrees that there is no objective medical evidence supporting that plaintiff suffers from issues with memory or attention and concentration difficulties. T at 24.

limitation.  See, e.g., Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("We have stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act.") (citation omitted).

Further, it is unclear what the ALJ means when he states that plaintiff's physical exam findings are not "strong."  T at 24.  The Court observes that, following this sentence, the ALJ cites to three medical records which are the same three records he cited in support for his conclusion that plaintiff did not meet or equal a listing.  Id. (citing Exh. 1 F at 3-5 (T at 200-03); Exh. 2F at 20-11 (T at 264-65); Exh. 4F at 6 (T at 321)).  However, as discussed above, exhibit 1F is from 2011, well before his onset date, and Exhibit 2F and 4F represent less significant findings than other treatment notes in the record from near those dates.  The ALJ does not explain in his decision how other treatment notes which showed issues with gait, balance, and weakness affected his credibility assessment.  The Court finds the ALJ's finding that plaintiff's treatment history is "not strong," and citing to just three medical records, one of which was two years before the onset date, fails to address how medical evidence suggesting greater limitations weighed into his credibility findings, nor does it explain the ALJ's apparent conclusion that plaintiff's daily activities suggest that plaintiff could be more active.

As a final point, the ALJ relies on the fact that plaintiff's cane was not prescribed in according less credibility to plaintiff's claims of limitation.  T at 24.  Although the Commissioner may consider whether a cane is prescribed in determining whether it is medically necessary, see generally SSR 96-9p, there is at least some evidence that Dr.

Robb concluded that the cane was medically necessary on plaintiff's "bad days." Id. at

390.  It is not clear if the ALJ considered plaintiff's need for a cane when his symptoms

are exacerbated.

In sum, as the ALJ failed to (1) sufficiently explain how the activities of daily living

he relied on – namely, plaintiff's watching television, driving, and smoking support a

finding that plaintiff "is not as limited as he has potrayed himself to be, and (2) how the

remaining medical evidence either supports or detracts from plaintiff's claims of

limitations, his credibility finding is not supported by substantial evidence.  Accordingly,

on remand, such findings must "sufficiently specific to make clear to the individual and

to any subsequent reviewers the weight the adjudicator gave to the individual's

statements and the reasons for that weight."  Osario, 2006 WL 1464193, at *6.[16]


### 4.  Obesity

As the Court finds that remand is necessary for the above-discussed reasons,

the Court will touch only briefly on plaintiff's argument that the ALJ failed to properly

consider plaintiff's obesity in forming an RFC assessment.  The ALJ explicitly noted that

plaintiff "weighs 295 pounds, yielding a body mass index of 47.6" and provided that he

"has considered the effects of the claimant's obesity in reducing th claimant's residual

functional capacity pursuant to Social Security Ruling 02-01p."  T at 22.  Plaintiff

---

[16]  Plaintiff also argues that the ALJ presented to the vocational expert inaccurate hypotheticals because they failed to "incorporate limitations set forth in the Medical Source Statement or RFC report from Plaintiff's treating physician[.]"  Dkt. No. 14 at  27.  As the Court finds that the ALJ did not properly apply the treating physician rule as it relates to Dr. Robb, on remand, should the Commissioner seek the testimony of a VE, any hypotheticals presented must reflect any updates or changes made to the plaintiff's RFC, should any be made after consideration of the various factors set forth herein.

argues that this is an insufficient discussion because "the ALJ never discusses specifically how obesity impacts each of the above exertional functions." Dkt. No. 14 at 28.

Further, plaintiff points to no medical evidence in his one-paragraph obesity argument that suggests that his obesity causes him additional functional limitation beyond those allegedly caused by his multiple sclerosis. Dkt. No. 14 at 28. Indeed, at the hearing, although plaintiff provided that he had been advised to lose weight by doctors, he did not allege that his obesity causes him any additional symptoms. T at 54. Indeed, the opined limitations set forth by Dr. Robb and consultative examiner Dr. Perkins-Mwantuali, explicitly stated that they were due to plaintiff's fatigue, balance issues, and numbness, and did not attribute any of their proposed limitations to his obesity. T at 379, 388-94. Moreover, the ALJ limited plaintiff to sedentary work. Although there are various matters that must be considered on remand related to this RFC, plaintiff fails to express – apart from limitations he attributes to multiple sclerosis – a limitation to sedentary work fails to take into account his obesity. Regardless, as the matter must be remanded, on remand, consideration should again be given to plaintiff's obesity in determining his RFC.

### III.  Conclusion

Having reviewed the administrative transcript and the ALJ's findings, for the reasons stated herein, the Court concludes that the Commissioner's determination is not supported by substantial evidence.

**WHEREFORE**, for the reasons stated above, it is hereby

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 16) be **DENIED**, that plaintiff's motion for judgment on the pleadings (Dkt. No. 14) be **GRANTED**, and that the Commissioner's decision denying disability benefits be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with Memorandum-Decision and Order; and it is

**ORDERED**, that copies of this Decision and Order be served on the parties.

**IT IS SO ORDERED.**

Dated: March 24, 2017
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge